IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 12-cv-02950-MSK-MEH

LISA M. JOHNSON,

        Plaintiff,

v.

SCHOOL DISTRICT NO. 1 IN THE COUNTY OF DENVER AND STATE OF
COLORADO; and
BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 1 IN THE COUNTY OF
DENVER AND STATE OF COLORADO,

        Defendants.

_____

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to Ms. Johnson's Motion for

Reconsideration **(# 72)** of the Court's September 23, 2013 Opinion and Order **(# 65)** granting, in

part, the Defendants' motion to dismiss, the Defendants' response **(# 76)**, and Ms. Johnson's

reply **(# 79)**; the Defendants' Motion for Summary Judgment **(# 92)**, Ms. Johnson's response **(#

105)**, and the Defendants' reply **(# 123)**; and the Defendants' Objections **(# 111)** to the

Magistrate Judge's March 21, 2014 Order **(# 103)** granting in part Ms. Johnson's Motion for

Sanctions **(# 90)**, Ms. Johnson's response **(# 122)**, and the Defendants' reply **(# 129)**.

## FACTS

The Court briefly recites the pertinent facts here and elaborates as necessary in its

analysis.

Ms. Johnson has been employed by the Defendants ("the District") as a classroom teacher

since 1991.  In 2008, the District's administrators sought her removal, ostensibly for poor

1

performance.  Ms. Johnson appealed her removal to an Administrative Law Judge, who conducted a hearing and determined that the District's complaints about Ms. Johnson's performance were not supported by evidence.  Ms. Johnson was reinstated in 2009 and began an assignment teaching at Gust Elementary School.  Based on letters sent to her by the District (which the District states were mailed in error), Ms. Johnson believed that her appointment was a temporary, one-year assignment for the 2009-10 school year.  (As discussed below, the District contends that it understood the position to be open-ended.)

In May 2010, Ms. Johnson testified before the Colorado General Assembly in opposition to Senate Bill 191 ("SB 191"), proposed legislation that would dramatically change the teacher hiring and assignment process (among other things).  In pertinent part, SB 191 reflected a legislative intent to evaluate school principals based on the performance of the schools' staff and students.  C.R.S. § 22-63-202(2)(c.5)(I).  To do so, the bill sought to end a process known as "direct placement" or "forced placement," by which tenured (a/k/a "nonprobationary") teachers who were displaced from their teaching positions for various reasons would be assigned by the District to other teaching positions at other schools, sometimes over the objection of the school's principal.  Instead, SB 191 provided that teacher hiring and assignments would only be made by "mutual consent" of the teacher and the corresponding school principal, giving the principal more control over the composition of the school's staff.  Controversially, the bill provided that nonprobationary teachers who were displaced and otherwise unable to obtain a mutual consent position with another school would, after a certain period of time, be placed indefinitely on unpaid leave until such time as they located a new teaching position.  The District strongly supported SB 191, but Ms. Johnson testified against it, stating that it granted too much power to school administrators to fabricate poor evaluations in order to displace unwanted teachers.

Despite Ms. Johnson's opposition, the bill passed and was signed into law in Spring 2010, taking effect immediately.

At the end of the 2010 school year, Ms. Johnson, believing her one-year appointment to have ended, attended a job fair hosted by the District.  At the job fair, various schools posted their open teacher positions for the coming school year and invited applications.  Ms. Johnson applied for dozens of open positions, but received few interviews and no offers.

In mid-2010, the District apparently offered Ms. Johnson the opportunity to continue teaching at Gust Elementary for the 2010-11 school year.  Ms. Johnson accepted.  Although the parties have differing understandings as to the reason, they agree that Ms. Johnson's assignment came to an end at the end of the 2011 school year.  (Ms. Johnson contends that she was only offered a one-year position for 2010-11; the District contends that her open-ended appointment that began in 2009 was terminated due to a budget cut.)   At the conclusion of the school year in 2011, Ms. Johnson again attended the District job fair, applied for numerous open positions at various schools, but was not selected for any.

The District offered Ms. Johnson a temporary, one-year assignment at Greenwood Elementary School for the 2011-12 school year, and Ms. Johnson accepted.   This was not a mutual consent assignment, and thus, the District advised Ms. Johnson that, by operation of SB 191, she had one year to find a mutual consent position.  Ms. Johnson again applied for many open positions at District job fairs, but was not selected.  Thus, at the end of the school year in 2012, the District placed Ms. Johnson on unpaid leave.

Ms. Johnson then commenced the instant action.  She asserted three claims: (i) common-law breach of contract, in that Colorado statutory law governing teachers "creates a contract by operation of law" and that the District breached that contract by terminating her without a

hearing as required by C.R.S. § 22-63-202 and by failing to retain her in a "mutual consent" position after her dismissal was overturned; (ii) retaliation based on the exercise of First Amendment rights, in violation of 42 U.S.C. § 1983; and (iii) deprivation of a property interest in her job without Due Process, in violation of 42 U.S.C. § 1983.

The District moved to dismiss Ms. Johnson's claims under Fed. R. Civ. P. 12(b)(6). The Court referred the motion to the Magistrate Judge, and in March 2013, the Magistrate Judge recommended that the motion be granted. Ms. Johnson filed timely Objections to the Recommendation, and on September 23, 2013, the Court partially adopted the Recommendation, finding that Ms. Johnson had adequately alleged a § 1983 claim sounding in First Amendment retaliation, but agreeing with the Magistrate Judge that Ms. Johnson's § 1983 Due Process and breach of contract claims were fatally deficient.

Ms. Johnson moves (**# 71**) for reconsideration of the Court's September 23, 2013 Order, arguing that: (i) the Court erred in finding that she "makes no allegation that she was tenured at the time she was placed on unpaid leave," such that the Court's dismissal of the Due Process claim was erroneous; (ii) the Court misinterpreted the provisions of C.R.S. § 22-63-202(2)(c.5) in dismissing her breach of contract claim; and (iii) the Court failed to consider her alternative breach of contract claim premised on the District "maintaining, relying on and disseminating negative documents pertaining to her."

Separately, the District moves (**# 92**) for summary judgment on Ms. Johnson's remaining First Amendment retaliation claim, arguing that Ms. Johnson cannot show that she suffered an adverse employment action or show that any such adverse action was causally-connected to her First Amendment activities (among other arguments).

Meanwhile, on the last day of the discovery period, the District served supplemental disclosures identifying 10 new potential witnesses: school principals and other individuals who interviewed Ms. Johnson for open positions. Contending that the late disclosure prejudiced Ms. Johnson's ability to obtain discovery about these witnesses, Ms. Johnson moved **(# 90)** for sanctions against the District pursuant to Fed. R. Civ. P. 37(c)(1), seeking to preclude the District from offering evidence from the late-disclosed witnesses. The Court referred the matter to the Magistrate Judge for determination. In a March 13, 2014 Order **(# 103)**, the Magistrate Judge granted Ms. Johnson's motion in part, finding the District's late disclosure of the witnesses to be untimely and prejudicial to Ms. Johnson, but not in bad faith. Thus, the Magistrate Judge rejected Ms. Johnson's request for a preclusive sanction, but reopened discovery to permit Ms. Johnson to engage in written and oral discovery regarding the 10 new witnesses. The Magistrate Judge also granted an award of attorney fees to Ms. Johnson for the cost of bringing the motion for sanctions.

The District filed Objections **(# 111)** to the Magistrate Judge's Order, requesting review by this Court. The District argues: (i) the disclosures were timely made because it was only late in the discovery period that the District concluded that it may need to call the principals and other individuals Ms. Johnson interviewed with as witnesses in its case; (ii) the Magistrate Judge erred as a matter of law in finding that supplemental disclosures made within the discovery period were nevertheless untimely; (iii) the Magistrate Judge erred in finding that Ms. Johnson was prejudiced by the late disclosure; and (iv) the additional discovery and attorney fees granted by the Magistrate Judge as a remedy were an abuse of discretion.

## ANALYSIS

### A.  Motion for reconsideration

Ms. Johnson moves for reconsideration of the Court's September 23, 2013 Order under Fed. R. Civ. P. 59(e).  Such relief is appropriate where there has been a change in the controlling law, newly discovered evidence, or "the need to correct clear error or prevent manifest injustice"; it is not, however, an appropriate means to "revisit issues already addressed or advance arguments that could have been raised in prior briefing."  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  A "manifest injustice" may occur where the Court has misapprehended the facts, a party's position, or the controlling law."  *Id.*

Ms. Johnson first takes issue with a passing comment by the Court to the effect that she "makes no allegation that she was tenured at the time she was placed on unpaid leave."  Ms. Johnson points out – correctly – that she repeatedly alleged that she was "nonprobationary," and that, under Colorado law, the terms "nonprobationary" and "tenured" have generally been considered synonymous.[1]  However, correction of this misstatement does not fundamentally alter the Court's prior reasoning or change the outcome.

The Colorado Supreme Court in *Howell v. Woodlin School Dist.*, 596 P.2d 56, 60 (1979), recognized that "a grant of tenure . . . engenders a reasonable and objective expectancy of continued employment," sufficient to amount to a constitutionally-protected property interest.  Assuming that *Howell* remains good law in light of changes enacted by SB 191 (a question this Court need not resolve), the property interest created by tenure is implicated only by its deprivation – *i.e.* termination of the teacher's employment.  *See e.g. Frey v. Adams County*

---

[1]     SB 191 effected certain changes with regard to teacher tenure, most notably providing that nonprobationary teachers who receive repeated poor evaluations may be returned to a probationary status.

*School Dist.*, 804 P.2d 851, 855 (Colo. 191) (constitution "require[s] a hearing before the employment of a person who has once acquired status as a tenure teacher can be <u>terminated</u>") (emphasis added).   As the Court explained, Ms. Johnson was not, and has not been, "terminated" from her employment with the District.  Rather, pursuant to C.R.S. § 22-63-202(2)(c.5)(IV), she has indefinitely been placed on "unpaid leave" status, and as soon as she can secure another teaching position, she will be "reinstate[d] . . . at the [salary and benefits] level [she] would have been if [she] had not been placed on unpaid leave."  Specifically, this Court noted that "[a]lthough the effect of being placed on unpaid leave is similar to dismissal, the statute treats the two differently."  Because Ms. Johnson has yet to be actually deprived of her tenured position via to a termination, she has yet to experience a deprivation of her constitutionally-protected property interest in her job.  *Accord Masters v. School Dist. No. 1, Colo. Dist. Ct.,* Denver County Case No. 14-cv-30371 (Martinez, J., Jun. 6, 2014) (slip op.).[2]

Ms. Johnson goes on to argue that, in finding her to be on "unpaid leave," this Court has misconstrued SB 191 itself.  She contends that "unpaid leave" status applies only to those tenured teachers who lose their classroom position as a result of certain specified circumstances: "drop in enrollment; turnaround; phase-out; reduction in program; or reduction in building, including closure, consolidation, or reconstitution."  C.R.S. § 22-63-202(2)(c.5)(VII).  The Court rejected this interpretation of the statute in its September 23 Order, and takes the opportunity to clarify the matter further here.

By its own terms, SB 191 reflects the legislature's finding that "for the fair evaluation of a principal based on the effectiveness of his or her teachers, the principal needs the ability to

---

[2]    *Masters* involved facial contractual and constitutional challenges by teachers to certain provisions enacted as part of SB 191.  The Colorado District Court for Denver County rejected those challenges.  The Court understands that the case is now on appeal.

select teachers who have demonstrated effectiveness . . . that support[s] the instructional practices of his or her school." C.R.S. § 22-63-202(2)(c.5)(I).  As noted above, the law requires individual school principals to grant consent to hiring or placement of teachers in their schools, ending the policy of "direct placement" of teachers by the District over principals' objections.

All of the pertinent statutory language enacted by SB 191 is contained in a single, densely worded subsection, which the Court will hereafter refer to as "section (c.5)." C.R.S. § 22-63-202(2)(c.5).  Within subsection (c.5) are numerous subsections of interest.  Subsections (c.5)(II) and (III) provide that when "any active nonprobationary teacher [with certain performance ratings] has not secured a position through school-based [*i.e.* mutual consent] hiring," that teacher is placed in a "priority hiring pool," granting him or her "a first opportunity to interview for available positions." C.R.S. § 22-63-202(2)(c.5)(II)(A), (III)(A).  As noted above, subsection (IV) provides that nonprobationary teachers who have failed to obtain a mutual consent position after a certain period of time ("twelve months or two hiring cycles, whichever period is longer") shall thereafter be placed on "unpaid leave" status until such time as they obtain a mutual consent position. C.R.S. § 22-63-202(2)(c.5)(IV).  Subsection (V) allows a school district to "place a teacher in a twelve-month assignment" without otherwise tolling the two-year period of subsection (IV) (and seemingly permitting some "direct placements," notwithstanding the operation of subsection (I)). C.R.S. § 22-63-202(2)(V).  Finally, subsection (VII) states that "this paragraph (c.5) shall apply to any teacher who is displaced as a result of" various conditions, such as school closures, reductions in force due to drops in enrollment, etc. C.R.S. § 22-63-202(VII).

Relying on the doctrine of *expressio unius est exclusio alteris*, Ms. Johnson argues that subsection (VII) effectively circumscribes the scope of all of the previous provisions in section

(c.5).  *See generally Cain v. People*, 327 P.3d 249, 253 (Colo. 2014) (under the doctrine of *expressio unius*, "the inclusion of certain items implies the exclusion of others").  In other words, she reads the statute to provide that <u>only</u> teachers who are displaced due to one of the conditions specified in subsection VII are otherwise subject to section (c.5)'s provisions: going on priority hiring lists under subsection (II) or (III), subject to direct placement under subsection (V), and ultimately, susceptible to being placed on "unpaid leave" status under subsection (IV).  She contends that the she became displaced from her position for reasons <u>other</u> than those listed in subsection (VII) (but see below), and thus contends that she is <u>not</u> subject to placement on unpaid leave under subsection (IV).  Thus, she argues, she is not actually on "unpaid leave," but indeed, has actually been terminated from her employment with the District.

Putting aside the factual question of whether Ms. Johnson's current status is a result of a subsection (VII) event or not (the District contends that it is, Ms. Johnson contends it is not), the Court finds Ms. Johnson's legal argument to be without merit.

Ultimately, the Court must construe the statute to "give effect to the legislative purpose underlying the statutory enactment."  *Beeghly v. Mack*, 20 P.3d 610, 612 (Colo. 2001). *Expressio unius* is a canon of construction, one of many guidelines that a court may use in attempting to interpret a statute (or other document) the meaning of which is ambiguous. Although *expressio unius* is a tool that can be used to help reach the legislature's intended outcome, it is not the only tool to be used.  Courts employ numerous canons, including attempting to avoid interpretations that lead to absurd results, *Smith v. Zufelt*, 880 P.2d 1178, 1185 (Colo. 1994).  For example, the doctrine of *ejusdem generis* ("if general words follow the enumeration of particular classes of things . . . the general word will be construed as applicable only to things of the same general nature as the enumerated things"), *Land Owners United, LLC*

*v. Waters*, 293 P.3d 86, 92 (Colo.App. 2011); and avoiding interpretations that would render words or phrases superfluous, *Montes-Rodriguez v. People*, 241 P.3d 924, 927 (Colo. 2010).

Here, the Court finds that reading subsection (VII) as Ms. Johnson does would render other portions of the statute superfluous. Subsections (II)(B) and (III)(B) both address special rights that arise "when a determination is made that a nonprobationary teacher's services are no longer required for the reasons set forth in subparagraph (VII) of this paragraph (c.5)." C.R.S. § 22-63-202(2)(c.5)(II)(B), (III)(B) (emphasis added). If Ms. Johnson is correct that the legislature intended the entirety of section (c.5) to apply only to those teachers displaced for the reasons listed in subsection (VII), the underlined portion of the quoted language above is entirely unnecessary. Indeed, such a construction would render the entire organizational structure of subsections (II) and (III) unnecessary, as any teacher that was subject to subsection (II)(A) or (III)(A) would, by definition, also be subject to subsection (II)(B) or (III)(B). Because the construction urged by Ms. Johnson results in superfluous statutory language, the Court must be reluctant to adopt it.

By contrast, a reading of the statute that treats subsection (VII) as broadening the statute's reach results in no superfluity. Subsection (VII) essentially refers to a category of teachers who are displaced from their positions by either reduced demand ("drop in enrollment") or management-driven restructurings ("closure or consolidation," "turnaround" or "phase-out"). These may be types of displacements that the legislature may have considered to be atypical, warranting express statutory language to ensure that teachers affected by these events were governed by SB 191's operation, alongside those teachers whose displacements arose from more ordinary (and thus, unenumerated) reasons. *See e.g. Land Owners*, 293 P.3d at 92 (*expressio*

*unius* does not always apply just because the legislature has specifically listed certain things; it requires "a list of objects or functions that implies any object or function not listed is excluded").

Ultimately, the Court finds that whatever inference the doctrine of *expressio unius* urges in these circumstances, that inference is overcome by other canons of construction. In addition to producing superfluous statutory language, Ms. Johnson's argument that section (c.5) applies <u>only</u> to those teachers displaced under circumstances in subsection (VII) would also be contrary to the legislature's expressed intention to require mutual consent in all teacher hiring. Certainly, there are nonprobationary teachers who lose their position under circumstances other than those in subsection (VII). If section (c.5) does <u>not</u> apply to these teachers, there is a statutory void, possibly resulting in <u>those</u> teachers being entitled to direct placement, or granting them some other rights commensurate with their nonprobationary status. In circumstances where different canons of statutory construction point in different directions, the Court is ultimately persuaded to apply the one that gives the most effect to the legislature's stated intention. That is the construction that the Court gave the statute in its September 23 Order and the one the Court reaffirms here.

Consequently, although the Court grants Ms. Johnson's motion for reconsideration insofar as the Court corrects the mistaken reference to her as being non-tenured, the Court nevertheless finds that she remains on "unpaid leave" under subsection (IV) and has yet to suffer a deprivation of any property interest in her job due to termination. Thus, her Due Process claim is properly dismissed. (The same reasoning disposes of Ms. Johnson's breach of contract claim.)

The Court  also summarily rejects Ms. Johnson's contention that her breach of contract claim survives, predicated on allegations that the Defendants "breached their contract with her by maintaining, relying on and disseminating negative documents . . . which were discredited in

[her] dismissal proceeding."  Even assuming that Colorado law creates a contractual agreement between Ms. Johnson and the District, Ms. Johnson points to no statutory provision that obligates the District to purge information in its records concerning her following the ALJ's ruling in 2009.  There is some testimony in the record to suggest that the District would normally purge such documents, and that it may not have in Ms. Johnson's case, but absent some legislative or contractual requirement that it do so, Ms. Johnson cannot pursue relief under a breach of contract theory.

Accordingly, Ms. Johnson's Motion for Reconsideration is granted in part, but upon reconsideration, the Court declines to modify its prior ruling.

### B.  Summary judgment

The District seeks summary judgment on Ms. Johnson's remaining First Amendment retaliation claim.

#### 1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

      If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and  enters

judgment.

      If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

      2.  Retaliation claim

      To prove a claim of retaliation for the exercise of First Amendment rights, Ms. Johnson

must show: (i) she engaged in speech on a matter of public concern; (ii) her interests in engaging

in the activity outweighed the District's interest in regulating it; (iii) the District took some

adverse action against her; and (iv) her protected speech was a substantial motivating factor in the District's decision to take that adverse action.  *Cillo v. City of Greenwood Village*, 739 F.3d 451, 460-61 (10th Cir. 2013).  The District concedes, at least for purposes of this motion, that Ms. Johnson's May 2010 testimony before the legislature satisfies the first two elements.[3]  However, it contends that Ms. Johnson cannot establish that she was subjected to any adverse action, much less that such action was motivated by her speech to the legislature.  In considering this question, the Court is mindful of its own prior ruling that, due to the two-year statute of limitations applicable to this claim, Ms. Johnson is limited to demonstrating adverse actions that occurred in or after October 2010.

---

[33]     Ms. Johnson argues that her testimony before the ALJ in her own dismissal proceeding in late 2008 constituted an additional instance of protected conduct.  She contends that her testimony at her dismissal hearing addressed general public concerns regarding:

> the topic of teacher performance, how it should be measured and evaluated, what constitutes good performance and poor performance, what data should be gathered to support performance determinations, what procedures should be followed in making such determinations, what measures and resources should be employed to assist deficient teachers in improving their performance, and what procedures and requirements should be employed to dismiss teachers for poor performance.

Ms. Johnson does not supply the Court with a transcript from the hearing or any other evidence from which the Court could ascertain whether her conclusory characterization of the scope of her testimony is accurate.  She provides only the ALJ's decision, which yields no particular insight into the nature of Ms. Johnson's particular testimony on these points (as opposed to testimony given by the seven witnesses Ms. Johnson called on her own behalf, or on the record as a whole).   Thus, Ms. Johnson's own conclusory statements about the content of her testimony fails to carry her burden of demonstrating that such testimony touched on matters of public concern.

Moreover, the statute of limitations on Ms. Johnson's retaliation claim is only two years.  Most of the alleged adverse actions that befell Ms. Johnson immediately after her testimony in 2008 would fall outside of the statute of limitations, and, as Ms. Johnson has offered only the most tenuous arguments to suggest that adverse actions taken against her after October 2010 somehow related to her dismissal hearing testimony more than two years earlier.  Thus, the Court finds Ms. Johnson has not carried her burden of showing that her testimony at the dismissal hearing constitutes additional protected conduct.

Ms. Johnson identifies several actions that she contends, taken together, constitute an adverse action: (i) maintaining her in one-year assignments for the 2010-11 and 2011-12 school years, rather than placing her in a mutual consent position; (ii) failing to contact and/or hire her for any of the teaching positions she sought at job fairs in 2010-2012; (iii) placing her on indefinite unpaid leave in 2012; (iii) "maintaining inaccurate and extremely negative information" about her performance in her personnel file (which is "accessible to School District Administrators"); and (iv) "inappropriately issuing [her] a [reduction-in-building] notice" in 2011.  She also alleges that, shortly after her testimony to the legislature in 2010, unidentified individuals, whom she describes only as "one or more administrators or other employees," "provided information to [Denver Post reporter] Susan green and/or took actions which enabled Ms. Greene to speak with particular parents of Ms. Johnson's former students who had negative opinions about Ms. Johnson."  (Ms. Greene eventually published a column that was disparaging of Ms. Johnson.)

The 10th Circuit has not offered a general rule guiding the determination of what constitutes an "adverse action" for purposes of a First Amendment retaliation claim; rather, it has tended to define the concept via examples, pointing to decisions made on the basis of political affiliation in "promotions, transfers, and recalls after layoff"; "substantial harassment and abuse"; and "removing job duties from an employee's portfolio or giving an employee a written reprimand or poor performance rating" would all constitute adverse actions.  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1207-08 (10th Cir. 2007).  *Brammer* seems to suggest that the touchstone is whether the action "would . . . deter a reasonable person from exercising his or her First Amendment rights" (a standard similar to that applicable in Title VII cases*, see Burlington Northern & Santa Fe RR v. White*, 548 U.S. 53, 69-70 (2006)), although

parenthetically, the 10th Circuit suggests that the standard in First Amendment cases might be even broader than that.  492 F.3d at 1208.  By that measure, the Court is satisfied that many, if not most or all, of the actions listed by Ms. Johnson could be considered sufficiently "adverse."

That leaves the District's argument that Ms. Johnson cannot show that any of these adverse actions were motivated by her testimony before the legislature in May 2010.  Certainly, several of these actions can be rejected out of hand: Ms. Johnson offers nothing more than speculation and surmise that someone must have talked to Ms. Greene about her, but she offers no evidence of who that person might be or what that person's connection is to the District might be (much less demonstrate some basis by which the District is culpable for that person's act).[4]  The decision by the District to maintain negative, allegedly inaccurate information about Ms. Johnson's performance in her personnel file ever since her dismissal was overturned in 2009 can hardly have been motivated by Ms. Johnson's testimony before the legislature in May 2010.[5]  And the Court rejects the argument that the District's decision to place her on unpaid leave in 2012 is evidence of retaliatory animus, as C.R.S. § 22-63-202(2)(c.5)(IV) required the District to take that action as a result of Ms. Johnson not having secured a mutual consent position in the

---

[4]      The District concedes that its Chief Information Officer, Michael Vaughn, spoke with Ms. Greene, giving "a very general statement regarding the District's impression of Plaintiff's dismissal hearing," but did not provide specifics regarding Ms. Johnson's employment or commentary about SB 191.   In response, Ms. Johnson does not point to any specific statement made to Ms. Greene by Mr. Vaughn as being particularly disparaging of her, despite having had the opportunity to depose Mr. Vaughn.
         In all other respects, Ms. Johnson acknowledges in her brief that she "presently lacks information as to *inter alia*: all of the statements, and the contents of those statements, made to Ms. Greene by the Defendants' agents or employees

[5]      The Court does not understand Ms. Johnson to allege that the District purged the negative material from her personnel file after her reinstatement in 2009, only to return the material to her file following her testimony before the legislature in 2010.

two years prior.  *Id.* ("the school district shall place the teacher on unpaid leave") (emphasis added).   The Court then turns to the remaining issues.

### a.  Numerous applications without being hired

Certainly, it may be surprising that a teacher with Ms. Johnson's credentials could apply for more than 200 open positions at various job fairs, but in response receive only a handful of interviews and no offers.  But the District has established, and Ms. Johnson does not materially dispute, that the decision to interview or offer a position is made in the first instance by the principals and hiring committees established by the individual schools, rather by any person with policymaking authority for the District itself.  *See also* C.R.S. § 22-63-202(2)(c.5)(I) (requiring school principal's consent for every teacher hired).  Ms. Johnson does not specifically identify any of these school-level decisionmakers who rejected her applications for open positions, much less demonstrate those individuals' knowledge of her testimony before the legislature, their retaliatory animus,[6] and facts that would allow the Court to conclude that the District is somehow culpable for these individuals' hiring decisions.  Any of these defects is fatal to Ms. Johnson's attempt to premise her retaliation claim upon her non-hiring.

Ms. Johnson argues that the Court should draw an inference of retaliatory motive based simply on the sheer number of positions she unsuccessfully applied for, but she offers no legal authority for such an unusual proposition.  Ms. Johnson also makes an abbreviated and generalized argument that persons selected for the positions she applied for had less impressive

---

[6]      As noted herein, the District unnecessarily delayed the disclosure of the individuals who interviewed Ms. Johnson until the close of discovery.  However, Ms. Johnson has not made either the substantive or procedural showings of Fed. R. Civ. P. 56(d), nor requested that the Court delay adjudication of the District's summary judgment motion pending further discovery regarding these individuals.  Moreover, the Court notes that Ms. Johnson never sought to supplement her summary judgment response with any additional information gleaned from depositions of these individuals.

credentials than she did.[7]  Even assuming – certainly without actually finding – that various

school-level principals and hiring committees hired less-qualified candidates for positions that

Ms. Johnson sought, Ms. Johnson has still failed to articulate facts that would establish that her

non-selection was due to retaliatory animus on the part of those principals/committees, much less

show facts rendering the District itself liable for any such animus.

b.  <u>remaining contentions</u>

Ms. Johnson's remaining adverse actions – assignment to temporary one-year positions

and the allegedly false issuance of a "reduction in building" ("RIB," sometimes referred to as a

"reduction in building staff" notice or "RIBS") notice to her – require some additional factual

elaboration.

After the she was reinstated by the ALJ in 2009, Ms. Johnson had a meeting with various

District officials to discuss her placement.  As a result of that meeting, Ms. Johnson understood

that she would be reassigned to Gust Elementary school as an "intervention teacher" for the

remainder of the 2008-09 school year, and that she would then serve a one-year appointment for

the 2009-10 school year.  This impression was shared by some District officials, as Debra

Watson, a Human Resources official with the District, testified that she understood that Ms.

Johnson's assignment was for one year only, and that she obtained this information from

Instructional Superintendent Robert Woodson.

---

[7]      Ms. Johnson cites to a chart showing certain qualifications possessed by the candidates
ultimately selected for many of the jobs she sought.  She does not identify who prepared this
document or the source of the information contained therein.  (In reply, the District states that it
did not produce the chart.)   Without Ms. Johnson laying the necessary foundation for this chart,
it is not "presented in a form that would be admissible in evidence," and thus, is not properly
before the Court for summary judgment purposes. Fed. R. Civ. P. 56(c)(2).

However, this is somewhat inconsistent with the testimony of another District Human Resources official, Karen Bamburger.  Ms. Bamburger explained that Ms. Johnson's assignment to Gust Elementary was considered to be both a "direct placement" and a "mutual consent" position, as those terms were "essentially" the same thing prior to SB 191's passage.  Ms. Bamburger went on to testify that this placement was for an "unlimited" time, as "direct placements are not limited."   In any event, the District contends (and Ms. Johnson professes a lack of knowledge to dispute) that her position as intervention teacher was not a position under Gust Elementary's budget, but rather, was funded through a separate program at the District level.

Ms. Johnson completed this appointment through the end of the 2009-10 school year, by which time SB 191 had been enacted and taken effect.  Ms. Johnson sought a mutual consent position via the District's job fair, but was unsuccessful.  In or about June 2010, the District notified her that the District had secured funds to continue the intervention teacher position at Gust Elementary for the 2010-11 school year.[8]  Ms. Johnson understood that the position was again only for one school year.  (Ms. Bamburger was asked why, if Ms. Johnson's 2009-10 appointment was not limited in time, it became necessary for the District to make another decision to place her at Gust Elementary.  Ms. Bamburger replied that she did not know and was not involved in that decision.)

On multiple occasions in mid-2010, the District sent out letters to all teachers who were then on limited-term appointments under C.R.S. § 22-63-202(2)(c.5)(V), advising them of their obligation to obtain a mutual consent position.  Ms. Johnson received several of these letters,

---

[8]     Ms. Watson testified that Mr. Woodson advocated for terminating Ms. Johnson's position at the end of the 2009-10 school year to "stand by his word" that it would only be a one-year position.  His superior, Superintendent Pat Slaughter, overruled him and directed that Ms. Johnson's position be budgeted for another year.

although the District contends that this was a mistake, and that because Ms. Johnson's assignment to Gust Elementary pre-dated the enactment of SB 191, "the position was not considered a limited-term assignment." However, the District contends that in February 2011, Ms. Johnson's intervention teacher job "was subject to a budgetary reduction in building," such that the position would be eliminated at the conclusion of the 2010-2011 school year. Janice Roybal, the Principal at Gust Elementary, issued her a RIB notice, informing her that "your teaching position is being reduced" and that she was obligated to find a new mutual consent position.

Ms. Johnson argues that the RIB notice was entirely unnecessary given the fact that her intervention teacher assignment was scheduled to expire at the conclusion of the school year anyway. Ms. Bamburger agreed in principle, testifying that "if a teacher has been placed into a limited-term assignment, . . . you don't need to RIB that teacher, because they're in a limited-term assignment." However, Ms. Bamburger admitted that "is it perfect that school principals follow that process? No." Notably, Ms. Johnson has not come forward with any evidence that rebuts the District's contention that the intervention teacher position was terminated for budgetary reasons.

At the conclusion of the 2010-11 school year, Ms. Johnson looked for other mutual consent positions, but was offered none. The District offered her a one-year position at Greenwood Elementary School for the 2011-12 school year. In February 2012, the Principal at Greenwood Elementary issued Ms. Johnson a RIB, but subsequently realized that such a notice was unnecessary, given Ms. Johnson's limited-term assignment. Ms. Johnson completed that assignment and, as noted above, without a mutual consent position, was thereafter placed on indefinite unpaid leave.

Reduced to its essence, the preceding evidence suggests that there was considerable confusion as to Ms. Johnson's employment status from 2009-2012. If Ms. Johnson was serving a succession of one-year limited-term appointments, there was no reason for the RIB notice issued to her in February 2011, since RIB notices were not required to inform teachers of the scheduled end of a limited-term assignment. If, on the other hand, Ms. Johnson was serving in an indefinite-period mutual consent position beginning in 2009, it was unnecessary for the District to "reappoint" her for the 2010-11 school year and improper for the District to send her notices in mid-2010 advising her of the need for her to obtain a mutual consent position.

Ms. Johnson appears to assert that the former reflects the true state of affairs – she was serving successive one-year temporary appointments -- and thus contends that the RIB notice served upon her was purposefully "contrived" as a retaliatory move. Consistent with the discussion above regarding the motion for reconsideration, Ms. Johnson argues that, as of 2011, the District understood the various provisions of SB 191 (including the ability to place teachers on indefinite unpaid leave) to apply only to persons designated in C.R.S. § 22-63-202(2)(c.5)(VII) – as relevant here, teachers whose positions were eliminated via a RIB. Thus, she contends, the District knew it had to serve her with a RIB if it intended to ultimately place her on unpaid leave, and it did so via the June 2011 RIB, even though no such notice was warranted given her temporary status.

This Court finds Ms. Johnson's evidence and argument insufficient to demonstrate a genuine triable question of whether the District was motivated by retaliatory animus. The Court is reminded of the old adage "never attribute to malice to that which is adequately explained by incompetence." The record reflects that Ms. Johnson being reinstated by the ALJ was a somewhat unusual situation in the District and that there were no formal policies for dealing with

such a situation; as Ms. Bamburger stated, the District handles such situations "on a case-by-case basis depending on what happens at that hearing."  Coupled with a substantial change in the governing law in the interim, it should come as no surprise that there was confusion within the District itself over whether Ms. Johnson was in a temporary position or a mutual consent one, or whether she was required to receive a RIB notice or not.

Moreover, the Court finds that Ms. Johnson's argument does not follow logically.  If, as Ms. Johnson appears to assert, her initial assignment to Gust Elementary in 2009 was a limited-term one, that assignment certainly cannot constitute retaliation for her testimony before the legislature, as that testimony had not yet occurred.  But if the assignment was a temporary one, the established template controlled the designation of her future assignments: if her 2009-10 assignment was temporary, so too must her 2010-11 assignment have been, since Ms. Johnson does not allege that after 2009-10, she obtained the consent of the Gust Elementary principal for a permanent assignment.  If her 2009-10 assignment was temporary, Ms. Johnson became subject to the provisions of SB 191 at the conclusion of that school year, and was inevitably going to be placed on indefinite unpaid leave unless she secured a new mutual consent position, which the parties agree that she did not do.  The issuance of a RIB notice to her in 2011 may have been unnecessary, or it may have been "contrived," but, for the reasons set forth above, it was also inconsequential.  The Court has construed the terms of SB 191 as enacted to apply to Ms. Johnson regardless of whether she was subject to a RIB notice or not.

In addition, there is no evidence of retaliatory motivation by any of the individuals identified by Ms. Johnson.  Ms. Johnson has not pointed to any comments by any District official that criticized her for testifying against SB 191, any subtle threats to her regarding that

testimony, or any other activity that might suggest that anyone in the District harbored hard feelings over her opposition to the bill.

Indeed, the evidence suggests the contrary: Ms. Johnson testified against the bill in May 2010, and the following month, Pat Slaughter overruled Mr. Woodson and directed that Ms. Johnson be reappointed to her position at Gust Elementary for the 2010-2011 school year.  The first timely adverse action that Ms. Johnson identifies would be the February 2011 issuance of the RIB to her, an act that occurred nearly 10 full months after her legislative testimony, and which was shortly followed by Ms. Johnson receiving yet another reappointment to another one-year term for the 2011-2012 school year.  If the District was seeking to retaliate against Ms. Johnson for her testimony, it certainly played the long game.

Ultimately, however, the entire inquiry collapses for more prosaic reasons. Ms. Johnson has no evidence that the District retaliated against her because of her legislative testimony, but she has some scattered evidence that might suggest that certain individuals disagreed with the ALJ's decision to set aside her 2008 dismissal and direct her reinstatement in 2009.  For example, Ms. Johnson notes that in 2009, Ms. Watson encouraged the Principal at Gust Elementary to contact the Principal at Ms. Johnson's prior school – the Principal who rated Ms. Johnson as unsatisfactory and sought her dismissal.  If any retaliatory animus could be derived from such an act – and the Court does not find any (certainly not any that is within the statute of limitations) – it is retaliation premised upon Ms. Johnson challenging her dismissal, rather than as retaliation for her legislative testimony.

For the reasons previously stated, the Court has found that Ms. Johnson cannot assert a retaliation claim premised upon actions she took during the dismissal proceeding.  Even Ms. Johnson's entirely conjectural belief that District officials plied Ms. Greene with unspecified

derogatory information about Ms. Johnson's qualifications says nothing about an intent to retaliate against Ms. Johnson for opposing SB 191, so much as it suggests that the District disagreed with Ms. Johnson's assertion that her dismissal was improper.

Accordingly, the Court finds that Ms. Johnson has failed to come forward with evidence sufficient to demonstrate a genuine dispute of fact as to whether any of the adverse actions taken against her were motivated by any retaliatory animus because of her legislative testimony.  The District is therefore entitled to summary judgment on the sole remaining claim.

### C.  District's Objections

To the extent that the District's Objections to the Magistrate Judge's Order finding the District's late disclosure of certain witnesses to be sanctionable under Rule 37 require adjudication in light of the Court's grant of summary judgment to the District on the remaining claim,[9] the Court finds those Objections to be without merit.

Rulings on non-dispositive issues by a Magistrate Judge are reviewed by this Court pursuant to Fed. R. Civ. P. 72(a), and will be reversed only if they are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Accordingly, the District's Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made."  *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

---

[9]   Arguably, the Magistrate Judge's award of attorney fees to Ms. Johnson as a partial sanction has a significance that survives the entry of summary judgment to the District on the substantive claims here.

Examining the entirety of the record, the Court cannot say that the Magistrate Judge erred.  Indeed, it is not even a particularly close call.  The District's contention that only late in discovery did it conclude that it may need to rely on the testimony of the school principals and hiring committee members that rejected Ms. Johnson's various applications for open positions is laughably implausible.  A fundamental component of Ms. Johnson's retaliation claim is that the District took some unspecified actions to prevent her from obtaining a mutual consent position. It should have been patently obvious to the District early on that proof on this point would almost certainly entail calling as witnesses one or more of the individuals who actually considered Ms. Johnson's applications for open positions and rejected them.  Accordingly, the late disclosure of such witnesses, even if technically within the discovery period, was properly sanctionable under Rule 37 as untimely.  Accordingly, the Court overrules the District's Objections and affirms the Magistrate Judge's Order.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Ms. Johnson's Motion for Reconsideration (**# 72**), correcting a misstatement in its prior Order but otherwise leaving that Order unchanged.

The District's Motion for Summary Judgment (# 92) is **GRANTED**, and the Clerk of the Court shall enter judgment in favor of the District on the sole remaining claim in this action.  The Defendants' Objections (# 111) are **OVERRULED** and the Magistrate Judge's March 21, 2014 Order (# 103) is **AFFIRMED**.

Dated this 10th day of September, 2014.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge